Okay, Your Honor. Ray Estolano for Jorge Ramirez-Gomez. Basically, what we're facing here is a, we're facing a decision on whether to expand the scope of the bringing to offense as opposed to the transportation offense. The facts of the case are pretty simple and are undisputed. The defendant picked up illegal aliens from a house in San Diego hours after they were picked up in the desert by a smuggler, and he was caught here close to the Border Patrol checkpoint. This case, as I see it, hinges all on two things that are illuminated in the Ramirez-Martinez decision. The Ramirez-Martinez decision also involved a defendant in an alien smuggling type case, but the facts are different in it. In that case, the defendant waited in a bus at the desert close to the border and was caught there smuggling the aliens. And the court in this case talked about two different concepts. One, the fact that they felt that the defendant in that case qualified under accomplice liability because the aliens in that case, although they had crossed into the United States before they were picked up by the defendant in that case, had not reached their immediate destination. And for this court here, I think that's the issue that all this hinges upon. Ginsburg. Counsel, in Ramirez-Martinez, didn't he, the defendant, pick them up immediately upon their arrival? There was no time span in between as there was in this case? Yes, Your Honor. Does that make a difference? It makes a difference, I believe, Your Honor. In this case, the fact that the illegal aliens arrived to a house in San Diego and were there for hours means that they had already reached their immediate destination here in the United States. Wasn't their destination Los Angeles? Didn't the fact finders specifically find that the whole purpose of the smuggling scheme was to get the aliens to Los Angeles and that they didn't even have to pay the smugglers until they arrived in LA? The aliens' destination was Los Angeles, but the crime is a crime of bringing aliens to the United States. The district court found persuasive, as some of our cases have, the analogy to drug smuggling cases where the purpose of the drug smuggling is to bring, let's say, the cocaine to Los Angeles and that the crime is a continuing one which is not complete until it reaches its destination. Why shouldn't the logic of those cases and that analogy apply with equal force here? Well, because it's a slippery slope, Your Honor. If the crime of bringing aliens to the United States can expand all the way to Los Angeles, what's to stop the next case from expanding all the way to Washington? Well, would it make a difference, do you think, if instead of Los Angeles the destination had been Yakima and that your client had picked them up at the safe house near the border in San Diego and was driving up Interstate 5 to the state of Washington when they were intercepted and arrested? Well, I think in both cases, in Washington and Los Angeles, it's expanding the scope of the crime. Well, one of your clients was going to Tacoma, right? I believe so, Your Honor. One was going to Atlanta, ultimately. That was their destination in the United States. But I think Judge Thomas' point is the culmination of the smuggling was in Los Angeles. At least that's when they were going to get paid. Yeah, but the issue of whether they were going to pay or not, I think is not relevant to whether it's bringing people to the United States. I gather your argument is that the crime stops at the border unless you can show some agreement prior to that to do something else in the United States, or do you even go that far? I mean, Ramirez-Martinez seems to say if you can show they acted in concert or if you have some prearrangement that that's enough to convict one of aiding and abetting, even if the actions occur after the crime is complete. I believe Ramirez, at least my reading of Ramirez, is that it requires some concerted action before the crime is completed. I think it's established that you can't have accomplice liability after the crime has been committed, which is why I think the key issue is what the definition of immediate destination is. But if that were the case, then we'd have to decide all the drug smuggling cases differently, wouldn't we, where we have found that the people who offload the mothership on the beach as the cocaine is being landed are part of the concerted effort to smuggle the drugs into the United States. Even though the argument, at least in that 11th Circuit case, was that once the mothership had passed the 12-mile territorial limit that it had functionally crossed the border, and therefore they couldn't be charged with importation of narcotics or aiding and abetting the same. I think the drug cases are distinguishable from this case. Because it's aliens rather than drugs? Are we doing it on the basis of the contraband? Is that what you think the distinguishing factor should be? Well, not just of the contraband, but my understanding is in the alien, I mean, I'm sorry, in the drug cases, it's... Your Honor, I confess I'm not familiar well enough with the drug cases to comment on them. Do I save some time for rebuttal? Yes, Your Honor. Okay, you've got about almost two minutes. Good morning. My name is George Aguilar. I'm an assistant United States attorney. Counsel spoke of expanding the concept expressed in Nguyen and Ramirez-Martinez, Your Honor, spoke of perhaps a distinguishing factor found in Ramirez-Martinez. We submit that this case actually follows quite consistently with the holdings of Nguyen and Ramirez-Martinez. Ramirez-Martinez was a case where the defendant picked up the migrants who had crossed into the United States in the desert and had proceeded to a freeway. So it wasn't immediately after their entry into the United States. There had been some travel from the border to a freeway location, and it was done in the open. And Nguyen was the same way. It was done out in the open by a smuggling organization that perhaps wasn't as well organized, as well financed, as well prepared as the organization that accomplished the smuggling in this particular case. So I think, with respect to the time differences, all this case recognizes is that the smuggling operation that brought these migrants into the United States were just better organized and better financed. They had a load house. They were actually able to conceal the migrants coming into the United States for pickup within a home, as opposed to doing it near a freeway out in the open where Border Patrol might be able to find them, or out by the checkpoint, as I believe was the case in Nguyen. Well, counsel, let me tell you what bothers me about this case. We have two separate statutes. Yes. He clearly transported illegal aliens in the United States. There is a separate statute which requires specific intent to aid and abet bringing in a separate and distinct offense. Under your theory, anybody who transports illegal aliens in the United States is guilty of both statutes. Does that – is that true? No. It's not true. We're not extensive. How do you distinguish? Isn't that the logical extension of your argument? Because that's precisely my concern in this case. I think what the holdings of Nguyen and Ramirez-Martinez find with respect to concerted action, with respect to operation, is that there has to be an essential element. The defendant must fulfill an essential element of the operation in fulfilling the arrangement made by the migrants and the smugglers. In this particular instance, the migrants contacted the smuggling operation in Tijuana and arranged to be transported to Los Angeles. This particular defendant fulfilled that role. He was part of the machine, part of the operation, which worked to fulfill the objective, the inducement that was given to the migrants in Tijuana, that upon payment of certain fees, they would be transported to Los Angeles. So I don't believe, in an instance, let's say, for example, the migrants had made the arrangements with the smugglers in Tijuana to be transported to San Diego, and that was accomplished. And now the migrants or those people who wanted to be transported, who were here undocumented and illegally, wanted to be transported to Los Angeles. To get past the San Clemente checkpoint, the last law enforcement checkpoint that exists before Los Angeles. And they made arrangements at that point in time to make the trip from San Diego to Los Angeles. That would be a transportation case. But what evidence is there in the record that this defendant knew that these particular illegal immigrants, illegal aliens, had been told that they would be taken to Los Angeles, that he was part of that scheme? All I saw on the record was he runs a route. He stops by these houses, picks up the immigrants, takes them where he's told to take them. They get paid on the other end. That's true. But what evidence is there in the record that he was part of this concerted action to induce them to come to go to Los Angeles? Two things. First, the interaction he had with the migrants themselves. He went to two load houses, not just one. He went to two, and he instructed the migrants in each and every detail on how they were to enter the vehicle and how they were to be concealed for the trip to Los Angeles. Excuse me. How does that show concerted action that he was part of the plan to bring them in to take them to L.A.? He's just like a mole, I mean, in a way. He has a regular round trip. He picks up illegals at these houses and takes them to L.A. He hides them. Of course he hides them. I would disagree with the characterization that he's a mole. I think it's a reasonable inference and a fair inference to make for the trier fact, the fact finder, that a person who comes to a load house, who knows where it is, who in this particular instance actually took one of the migrants, Ms. Esquivel, put her in the car, had her covered with a sheet, then drove to another house, backed into the garage, again, suggesting familiarity with these sites, suggesting that he was part of the route. He does it all the time. And I think it's a fair inference that if someone has a regular route, that someone who is in charge of that aspect of taking the migrants from a load house, which, again, is a necessary element to this operation, into the car, concealing them, and then taking them across into Los Angeles, I think it's a fair inference for the district court or for the trier fact to make that this person was part of the machine, part of the operation, fulfilling the ultimate objective that was made in agreement that was made in Tijuana, that these people were to go to Los Angeles for payment. What is the evidence in the record that shows that he knew and had the specific intent to be part of this, quote, concerted effort to take them from Tijuana to Los Angeles? If it's under your description, then anyone who violates that statute also violates the other statutes. You know, again, Your Honor, I disagree, because I think it's, in this particular instance, we can limit that liability to the point where if it fulfills or is part of the essential operation of the agreement to transport these people or to bring these people from Mexico into a specific location. In this instance, it was bartered for and bargained to be in Los Angeles. That I think we can limit the liability for bringing in under those terms. And in this particular instance, you're looking for direct evidence, something the defendant stated or something that a co-conspirator may have stated to place them directly with the knowledge that somehow these people had crossed into the United States. I do think, however, and we're not going to find that in the record, but I think what we are going to find is a number of factors and facts which can give the trier fact and the fact finder a reasonable basis for an inference. In this particular instance, it's the defendant's assertion of managerial authority. Why does that differ from transportation? Not to interrupt, but why does that differ from transportation? I've been trying to listen carefully for a distinction. And to me, maybe it's just too simplistic in common sense. You bring them in, you transport them. Crime A, crime B. Looks like you transported them. I think the best argument you have, they weren't paid to the end, but I'm not sure that's positive. Unless you get off on the immediate destination theory, which I think is problematic for different reasons. But I'm struggling, as I think Judge Nelson did, what's the analytical difference between these crimes? Again, I think it, as Nguyen, and I think Nguyen answers this concern, Your Honor, and so does Ramirez-Martinez. Again, it is with the idea that it's a concerted action to fulfill the objective made by the smugglers and barred for by the smugglers. Let me stop you there. In both those cases, it makes sense to me because it culminates in some activity right around the border. Once we start extending, whether it's to Los Angeles or Tacoma or Atlanta, then I think it gets to be a different analysis. Or may. I'm not saying necessarily. I'm just expressing some of my problems with the case, too. That's the difficulty, I think. Because you can't charge two crimes for the same conduct. Sometimes they overlap, but, you know. I think the Aslan case, the Second Circuit case that was initially relied on by Nguyen, does recognize the overlap in the two offenses. For example, one of the migrants. It's not uncommon, I grant you. I'm sorry? Which is not uncommon, I grant you, but still. One of the migrants had actually stated at the trial that she was going to go to Tacoma, another one to Atlanta you had pointed out in the earlier argument. Let's say that the agreement had been in Tijuana, not to Los Angeles, but Tacoma. And in fact, there had been a transfer to a loathouse, again, to secure and to keep safe the But instead of going to Los Angeles, the defendant was going to go to Tacoma. I submit that he would have been, if he had been located or found out in San Francisco, that it would still have been part of the bringing in process. Again, because it fulfills the objective made by the smugglers and the migrants. If the agreement, if the operation had been limited to just bringing them into San Diego, the crime is completed upon their destination, upon not their immediate destination, but upon a reaching and satisfying the objective of the agreement. And once payment's made, then if the migrants want to be transported or to move from San Diego, past the vital San Clemente law enforcement checkpoint to points north or to points east, we have transportation. We can make those distinctions based on the actions of the smugglers themselves, as opposed to creating judicial distinctions or distinctions within the law. I think it's reasonable to allow the defendants to make those types of distinctions and to allow the prior fact to take these inferences, to take these facts into account and assessing them against the elements of the charge of aiding and abetting. That's not to say the government's going to get a conviction in any of those cases or many of those cases. It's just, I think, reasonable to infer the defendant's actions in this instance as fulfilling and aiding and abetting with the intent to violate the immigration laws that would warn a conviction and did warn a conviction in this case. You know, analytically, this gets troubling from another number of respects. I think the continuous crime theory that we had in 1326 really hasn't worked out all that well because it creates problems for the trial courts. It creates problems on venue. It creates problems on statute of limitations, and sometimes it benefits the government. Sometimes it works to the benefit of the defendant. But to say, as I guess you're saying, that we have a continuous crime that's not completed until they get to Tacoma, I think, would serve to perhaps create complications in the area of this crime that's not, at least right now, not very complicated. I don't know. It's something to think about. I mean, I realize that maybe this is a small case, but you guys prosecuted a whole number of cases, thousands of them. I think Judge Tallman pointed out with respect to the importation offenses, we have those types of analysis done in the importation offenses. I don't think the importation of human beings is going to be all that different or all that more complicated or all that different. So the complexities you're speaking of I think can be avoided. I don't think Anguin and Ramirez really complicate this area. I think it recognizes. It recognizes the scope within which these smuggling operations exist and the way they work. I think it's a plain recognition of how these things work. And I think this case shows how a better organized, more sophisticated operation, one that's enabled to actually have a home to load vehicles so they can keep the actual concealment of the aliens or the entry of the migrants into vehicles under concealment. There's a home. There's a tarp. There's a garage. These people are crawling out of windows into cars. Far easier to do within a home than, let's say, out in the brush or out in the canyon or near a freeway where exposure is far more likely to happen from law enforcement. So we have a smuggling operation here that's better prepared, better organized, and better financed. They actually have an asset, which is important. And the defendant's role in this is not only for that of transporting, such as a mole, but he's also entrusted with the knowledge of where this Daesh house is. And always the danger of it. I don't want to belabor the point. We're over time. But the fact that he has a house indicates he's got a good business in the United States. I'll transport any illegal you send to my house. And that's a crime. And he should be punished for that crime. It's adding on the inference that he knows. And as Justice Thomas said, the fact that he wasn't to be paid until they got there probably is the one fact in the record that supports this. But I appreciate your argument. Thank you very much. We've taken your time. Our questions, I hope you got to everything that you wanted to discuss today.  A short rebuttal? Yes, Your Honor. I wanted to just briefly address the drug issue that you were asking me about. My understanding is in the MacDougall case that related to drug smuggling. The issue wasn't the drugs come into San Diego and then the crime continues until you get to Los Angeles, Phoenix, et cetera. What they were talking about there was imaginary international boundary line 12 miles away from the shore. And that the crime wasn't complete until it actually got to the land of the city where it could be unloaded. And I was thinking about that. And that's actually very similar to a lot of the other cases that have been decided. You have aliens that are walking across the desert. And the crimes, they passed, technically they passed into the U.S. but the crime is not complete until they get to the motor home that's going to take them somewhere. Until they get to the car that's parked there. And, you know, I think that analysis might be useful to you in deciding this case. The immediate destination in the country, you know, is basically the first place that can be identified as the United States, the loading dock or the vehicle. What if they come in by plane and landed in the Nevada desert? And the reason they picked the Nevada desert was because it was remote and it would be unlikely that law enforcement would catch them unloading the contraband or the aliens. Wouldn't you agree that they're still involved in the smuggling venture at that point? The person that flied the plane or the person? The people who were unloading the plane when it lands in a remote location and the plane has come across the border with the contraband on board? I mean, arguably, yes, it would be the first destination that, the first landing in the civilized U.S. And didn't we recognize in Ramirez-Martinez that there may be temporal and geographical limitations and circumstances under which it would not be appropriate to charge someone with aiding and abetting the smuggling, but that that's what fact finders are for in order to determine whether the evidence is sufficient to establish. And it involves questions of what did the defendant know in terms of the overall conspiracy and what was his role in the offense, how key was he to complete it, and how remote in time and in place was his condom in comparison to the other men. And those are all questions of fact that have legal consequences once the facts are determined. But here in this case, there are certain facts that are already established so that the court can give a... Well, the district court seemed to be influenced heavily by the fact that he had to get them through the San Clemente checkpoint, which is, if you look at other Supreme Court authority, the legal equivalent of a border, is it not? I mean, it's like a roving border patrol checkpoint that's established 40 or 50 miles north of the border on freeways, which the Supreme Court has approved. Well, I think even the government conceded that it's not, that the judge didn't rely on that being a border. She certainly talks about the significance of the San Clemente checkpoint in moving aliens from the border to Los Angeles, doesn't she? It's part of her findings of fact, coupled with the circumstantial evidence of the secretive nature of the drug house and the way that he secreted the people and having folks climb in and out of windows to avoid detection in finding that he was part and parcel of a continuing crime here. I think those are all facts that prove transportation, not the bringing of people to the United States. If you look specifically at the defendant's intent, his intent was to transport, and the only way we get close to his intent being to bringing people to the United States is through convoluted extending of the border. It was quite a time difference here. They were kept, at least two of them were kept overnight. Is that right? In one of the houses before they were transported to the next house, as opposed to the other cases where they were picked up in 15 minutes or in a very short period of time. It was a longer, longer, they were here longer in this case than in others. Any further questions? Thank you, Counsel. Thank you. The case just heard will be submitted, and we will be in recess. I want to thank Rob Wagner for his help this week. As I mentioned, we had some very formidable scheduling problems, and Rob, you did a great job with that, as you always do. Thank you.
judges: D.W. Nelson, Thomas, Tallman